## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| ZOHAR WATERWORKS, LLC, *et al.,*[1] | : | Case No. 09-11179 (BLS) |
|  | : |  |
| Debtors. | | Jointly Administered |

**Related Doc Nos. 14, 15**

**(I)  OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS FOR AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS, (B) APPROVING CERTAIN BIDDING PROTECTIONS, (C) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) SCHEDULING AN AUCTION AND SALE HEARING;**

**(II)  OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING, (B) GRANTING CERTAIN LIENS, AND (III) MODIFYING THE AUTOMATIC STAY; AND**

**(III)  CROSS-MOTION TO CONVERT THE DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Committee") of Zohar

Waterworks, LLC, and B2 International Corporation (together, the "Debtors"), by and through

its undersigned proposed counsel, hereby objects to (I) the Motion of Debtors for an Order (A)

Approving Bidding Procedures for the Sale of Substantially All of Their Assets, (B) Approving

Certain Bidding Protections, (C) Approving the Form and Manner of Notice of the Sale and

Assumption of Executory Contracts and Unexpired Leases, and (D) Scheduling an Auction and

Sale Hearing [Docket # 15] (the "Bid Procedures Motion"); and (II) the Motion of the Debtors

---

[1]     The Debtors are Zohar Waterworks, LLC, d/b/a Tri Palm International, LLC, and B2 International Corporation, d/b/a Oasis Water.

Financing, (B) Granting Certain Liens, and (C) Modifying the Automatic Stay [Docket # 14] (the "DIP Financing Motion").

Moreover, because (i) the Debtors are burdened by an irreconcilable conflict of interest, where the Debtors and their pre-petition lenders, post-petition lenders, equity holders and proposed purchaser are all affiliates of Patriarch Partners, and (ii) the course charted by Patriarch for these cases forecloses any possibility of a chapter 11 plan, and would instead strip these estates of substantially all assets and causes of action for the sole benefit of insiders without affording any meaningful opportunity to investigate claims by or against those insiders or the causes of action being sold, the Committee cross-moves the Court for the entry of an order pursuant to 11 U.S.C. §§ 105(a) and 1112(b) converting these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code for cause.

In support of these objections and cross-motion, the Committee states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors filed these cases in order to transfer all of their assets and going concern value to their own shareholder/lender in a no-cash sale that will leave nothing behind for any other creditor constituency. Although bankruptcy courts are too often faced with §363 sales conducted for the sole benefit of secured creditors, the sale proposed here is different—and far worse—than the typical case, because here the secured creditor is an insider that sits on and controls every side of this transaction—as the buyer, the pre-petition lender, the DIP lender and, most critically, the debtor-in-possession sellers.

---

(continued...)

[1]      The Debtors are Zohar Waterworks, LLC, d/b/a Tri Palm International, LLC, and B2 International Corporation, d/b/a Oasis Water.

#10805272 v3

2. The proposed sale process has been designed to assure that no other buyer can possibly emerge with a higher or better bid. The Debtors are asking the Court to bless a 12-day "marketing" program run by a financial advisor with few qualifications and zero incentive to maximize price. Competitive bidders are not only chilled by this process, they are completely frozen out.

3. The proposed sale is a calculated play by an insider to force a sale when the market is down, so that it can "flush" the trade debt, cleanse itself of any claims that may exist against it, and reap the future profits of the business for its own benefit alone. The estates will be stripped even of assets on which the insiders hold no liens, and there will be no ability to confirm a plan of reorganization. Thus, the sale unfairly benefits the insider at the expense of administrative, priority and unsecured creditors, and it should not be approved.

4. Nor should the proposed post-petition financing be approved when it is hardly more than a means of assuring the insider's desired sale outcome. By making it an event of default under the DIP Facility if the sale is not accomplished on the insider's timetable—indeed, by making it an event of default if the assets are sold to anyone else—the insider is using the power of its purse strings to guarantee that no reorganization process will move forward, and no higher or better price will be obtained.

5. The DIP Facility is further designed to relieve the lenders, through a waiver of the estates' rights under § 506(c), of all the costs of preserving and liquidating their collateral—despite the fact that these cases are being prosecuted for the sole purpose of preserving and liquidating their collateral, with no corresponding benefit to any other Chapter 11 constituency.

#10805272 v3

6.     At the same time, the financing and sale process dictated by the insiders would result in a sale to those insiders, for no true consideration to the estates, of substantially all claims and causes of action, including all claims against insiders, regardless of whether the insiders hold a lien on such assets. All of this would occur on such a rushed timetable as to ensure that neither the Committee nor any other party in interest will have an adequate opportunity to (i) determine whether the Debtors are truly in financial extremis or whether the Debtors' "cash crisis" has been manufactured by the insiders to cleanse their equity investment of undesirable debt, (ii) investigate whether grounds exist to challenge the purported secured claims of the insiders, or (iii) if a sale is appropriate, adequately market the assets for sale.

7.     The circumstances leading up to the filing of this case are unique. Patriarch acquired debt of approximately $35 million from a third party, which debt was secured by certain assets of Oasis Corporation. Patriarch promptly foreclosed on these assets through a UCC Article 9 secured party sale, causing Patriarch's nominee (the Debtors) to acquire these assets. On March 31, 2008, Patriarch filed UCC-1 financing statements against all of the Debtors' assets, including a UCC-1 filing against commercial tort actions. On April 2, 2009, claiming to owe Patriarch over $72 million, the Debtors filed their chapter 11 petitions. Debtors elected to file on April 2, 2009, rather than a mere 2 days earlier, when the Debtors could have thereby preserved potential avoidance actions against Patriarch related to the March 31, 2008 UCC-1 filings.

8.     For these reasons, the Court should convert these cases to Chapter 7. There is no reasonable likelihood—or even intention—of rehabilitating, and there is no possibility that these Debtors can confirm a plan of reorganization. Moreover, there is no possibility that the Debtors can act as an independent representative of their estates. Under such

#10805272 v3

circumstances, a Chapter 7 trustee can liquidate the Debtors' assets, or can choose to operate if it so chooses, and the insider/lenders will receive no more than the value of their collateral (if any). At the same time, conversion to a chapter 7 would ensure that the chapter 7 trustee would have the full period of time contemplated by the Bankruptcy Code to investigate claims by and against the Patriarch insiders and to assert any claims that may exist.

## BACKGROUND

9.     On April 2, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code.

10.     On April 9, 2009, following an organizational meeting, the United States Trustee filed a Notice of Appointment of Committee of Unsecured Creditors.[2]

11.     According to the Debtors, they owe their general unsecured creditors in excess of $8.8 million.

12.     Zohar Waterworks, LLC ("Zohar") is 100% owned by Zohar II 2005-1, Limited. B2 International, Inc. is 100% owned by Zohar. On information and belief, Zohar II 2005-1, Limited is an affiliate of and controlled by Patriarch Partners. The sole member of Zohar's Board of Managers is Lynn Tilton. Upon information and belief Ms. Tilton also is the founder and controlling principal of Patriarch Partners.

13.     Upon information and belief, Zohar acquired its operating assets through its credit bid at a foreclosure sale in 2005. At about the same time, the Debtors entered into the pre-petition credit agreements with Patriarch Partners Agency Services, LLC and entities

---

[2]     The members of the Committee are:  (i) Morrill Motors, Inc. (ii) MA 265 North Hamilton Road, LLC; and (iii) Polar Ware Company.

affiliated with it (collectively "Patriarch" or the "Pre-petition Lenders").  Upon information and

belief, Patriarch Partners Agency Services, LLC also is managed or controlled by Lynn Tilton.

### The Bid Procedures and Sale Motions

14.     On the Petition Date, the Debtors filed the Bid Procedures Motion as well

as a Motion for Order Authorizing (I) the Sale of Substantially All of the Debtors' Assets Free

and Clear of Liens, Claims and Encumbrances and (II) the Assumption and Assignment of

Executory Contracts and Unexpired Leases [Docket # 16] (the "Sale Motion").  Through these

motions, the Debtors propose to sell substantially all of their assets to LVD Acquisition, LLC

(the "Patriarch Buyer").  The Patriarch Buyer is an affiliate of both the Debtors and the Patriarch

Lenders.

15.     The Debtors seek to impose the following deadlines (the "Sale Schedule")

on the sale of their assets to their shareholder/lender/buyer:  (i) competitive bids due on or before

April 29, 2009; (ii) an auction, if necessary, to be held no later than May 1, 2009; and (iii) a sale

hearing to be held on May 4, 2009.

16.     Despite the fact that the sole beneficiary of the sale process would be the

Patriarch insider, which seeks to effect a "super foreclosure" without having to prove up its liens

or claims, Bid Procedures Motion seeks approval of a stalking-horse agreement with the

Patriarch Buyer that includes a $300,000 expense reimbursement to be paid if the assets are sold

to any other buyer.  Among the assets to be sold to the Patriarch Buyer are all avoidance actions

the estates may possess against Patriarch relating to the pre-petition debt.

### The DIP Financing Motion

17.     Also on the Petition Date, the Debtors filed the DIP Financing Motion to

request approval of post-petition financing (the "DIP Facility") to be provided by Zohar II 2005-

1, Limited and Zohar III, Limited (the "Patriarch DIP Lenders," and together with Pre-Petition

Lenders, the "Patriarch Lenders"). In information and belief, the Patriarch DIP Lenders are also affiliates of Patriarch, and Patriarch Partners Agency Services, LLC is the proposed DIP Agent.

18. On April 3, 2009, the Court entered its Interim Order (I) Authorizing the Debtors to obtain Post-Petition Secured Financing, (II) Granting Certain Liens, (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing [Docket # 36] (the "Interim DIP Order"). The Interim Dip Order authorized the Debtors to borrow up to $1.5 million from the DIP Lenders and scheduled a final hearing for April 17, 2009.

19. The DIP Facility provides for a maximum lending commitment on the part of the Patriarch DIP Lenders in the amount of $3.4 million. In exchange for this borrowing availability, the Debtors intend to waive the estates' rights under section 506(c) to surcharge the lenders for the cost and expense associated with the preservation and disposition of their purported prepetition collateral. Additionally, the Debtors have agreed to waive the estates' rights to challenge the pre-petition claims and liens asserted by the Patriarch and to release Patriarch from all liability arising out of their pre-petition relationship, and to bind all other parties to such waivers and releases unless a party with standing files a proceeding challenging the claims and liens by as soon as April 27, 2009.

-7-

## OBJECTIONS

## I.  THE BID PROCEDURES MOTION SHOULD BE DENIED.

### A.  There Is No Sound Business Purpose for the Sale.

20.  A debtor may not sell its assets under section 363 of the Bankruptcy Code unless it shows a "sound business purpose." *See e.g., Meyers f. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996). Moreover, when a debtor proposes to sell *all* of its assets, without affording its creditors the protections of the disclosure statement and plan confirmation process, it must both articulate a sound business reason for doing so *and* make a strong showing that the sale is in the best interests of its estate. *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *Stephens Indus., Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir. 1986). A pre-plan sale must "further the diverse interests of the debtor, creditors and equity holders alike". *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

21.  Some of the factors courts examine to determine if a sale of substantially all of a debtor's assets outside of the plan confirmation process is being conducted to further a sound business purpose include:

> (i) the proportionate value of the assets to the estate as a whole, (ii) the amount of elapsed time since the filing, (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future, (iv) the effect of the proposed disposition on future plans of reorganization, (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, (vi) which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, (vii) whether the asset is increasing or decreasing in value.

*Lionel*, 722 F. 2d at 1071; *See e.g., In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D.Del. 1991).

#10805272 v3

22.     These factors militate against a sale at this time.  First, the assets to be sold comprise the entirety of the Debtors' estates, and second, if the sale is approved, there will be nothing left upon which to base a reorganization.  Third, this case is in its infancy.  Fourth, the Debtors have made no showing that the assets are decreasing in value.  Where the assets being sold are not diminishing in value, the sale price will not result in sufficient funds to provide a return to unsecured creditors or where the businesses being sold could be reorganized for the benefit of all creditors, there is no valid business purpose to sell outside the plan process.  *See In re Fremont Battery Co.*, 73 B.R. 277 (Bank. N.D. Ohio 1987).

23.     Justification for evading the plan confirmation process may be found if the debtor will be unable to continue operations absent a quick sale or if its assets are deteriorating in value, *see Indus. Valley Refrigeration*, 77 B.R. at 18; *In re TWA*, 2201 LEXIS 980 *34-35 (Bankr. D. Del. 2001), but neither of those circumstances is present here.  The Debtors offer no evidence to prove either (a) that they will be unable to continue operations absent a quick sale, or (b) that their assets are deteriorating in value.  Moreover, the insider nature of the transaction calls into question the Debtors' financial projections purporting to justify the need for an expedited sale, as no party in interest will have a meaningful opportunity to evaluate or test the data and assumptions used to formulate those projections

24.     The Debtors cite only two factors to justify a sale at this time.  First, they assert that they are substantially overleveraged, but they offer no evidence to support this assertion.  Moreover, if this is true it presumably has been true since they entered into the pre-petition credit agreements with Patriarch almost four years ago.  The Debtors do not allege any crisis that has recently arisen as a result of being overleveraged.  Second, they point to certain state court litigation which has not even been reduced to judgment.  No execution efforts have

#10805272 v3

been commenced, and none of the Debtors' assets are in imminent jeopardy of attachment. Therefore, neither of these factors can be used to justify a no-cash transfer of all assets to an insider, and what amount to sweeping insider releases, in less than 30 days' time.

25.     It is obvious that the Debtors' true rationale for selling their assets now is that the sale is dictated by their insider lenders/shareholder, who are, not coincidentally, affiliates of one another. Yet the appeasement of major creditors, including a debtor's secured creditor, is not a sound business reason for conducting a sale. *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987). This is particularly so when the creditor that is demanding the sale is the very same party that currently owns and operates the Debtors and that aims to receive the assets free and clear of all other interests.

26.     A § 363(b) sale should not be approved unless the debtor can show that it will benefit the estates as a whole. In *In re Au Natural Restaurant, Inc.*, 63 B.R. 575, 581 (Bankr. S.D.N.Y. 1986), the court found that most of the sale proceeds would benefit one creditor only and it refused to approve the transaction. Likewise, in *In re Fremont Battery Co.*, 73 B.R. at 279, the court found no business reason to justify the sale where the proceeds would, at most, benefit a single creditor.

27.     In *In re Encore Healthcare Assoc.*, 312 B.R. 52 (Bankr. E.D. Pa. 2004), the sole purpose of the proposed sale was "to liquidate assets for the benefit of the secured creditor." *Id.* at 54, which could have easily been accomplished outside bankruptcy. *Id.* at 56. Thus, the court refused to approve the sale, ruling that it "goes beyond the most liberal interpretation of *Lionel*."

#10805272 v3

**B.**     **The Sale Process is Not Fair and Open.**

28.     A § 363 sale must be conducted through "a fair and open process." *Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, * 32 (Bankr. D.N.J. 2008), *citing In re Abbotts Dairies*, 788 F.2d 143, 149 (3d Cir. Pa. 1986).

29.     The Debtors do not propose a fair and open auction process. First, far too little time has been allowed. The Debtors are asking for a bid deadline just *twelve (12) days* from the date of the hearing to approve the bid procedures. Perhaps in an extreme case, where the emergency is clear, such an abbreviated program might be approved, but only if the debtor had already conducted substantial and arms-length pre-petition marketing of its assets. remarkably, there is no mention by the Debtors of any such marketing having occurred here. Indeed, the Committee is informed that the Debtors have not yet even established a data room for due diligence investigations.

30.     Moreover, the Debtors state in their Bid Procedures Motion that they will not make any due diligence information available to potential bidders until they first execute a confidentiality agreement (which has not yet been provided), and submit a statement demonstrated a bona fide interest and the financial ability to purchase the assets. *See* Bid Procedures Motion, ¶ 11. Any potential bidder would have to meet these requirements, gain access to the due diligence materials, and submit a bid, all within 12 days' time.

31.     The proposed sale program is further flawed by the structure of the "purchase price." The stalking-horse price is expressed not in dollars, but as follows: "(a) as to Zohar Waterworks, the assumption of the Assumed Liabilities, and (b) as to B2 International Corporation, the assumption of the DIP Facility Obligations and $1,000,000 of the Pre-Petition Term and Revolver Obligations." Stalking-Horse Agreement, ¶ 2.3. The Debtors expressly represent that this is not intended as a credit bid, yet the Bid Procedures prohibit any competitive

bidder from similarly including assumed liabilities in its purchase price. As a result, the Patriarch Buyer, as Patriarch's hand-picked stalking-horse, is permitted to use one form of currency, while all others must bid with another.

32.     The proposed sale process has clearly not been designed to maximize price. The process is to be run by a restructuring officer,[3] who will also be charged with all of the other duties of a CRO, such as managing cash flow, complying with Chapter 11 reporting requirements, and managing the Chapter 11 bankruptcy process. The CRO is not an investment banker and appears to have limited experience in this field. Moreover, he is to be compensated at a flat monthly fee of $20,000, with no success fee component or any other incentive to maximize the sale price. Finally, and tellingly, he was, from at least 2004 through 2008, the CFO of a company owned by a Patriarch affiliate.

### C.     The Stalking Horse is an Insider of the Debtors and Will Chill Bidding.

33.     As seems to have become the norm in chapter 11 cases of Patriarch portfolio companies, Patriarch and its affiliates are wearing multiple hats in this proceeding. They are the pre-petition lenders. They are the DIP lenders. They are the stalking-horse purchaser. They own all the equity in the Debtors. The control the management of the Debtors.

34.     Patriarch clearly qualifies as an insider of the Debtors within the meaning of section 101(31) of the Bankruptcy Code. *See In re Missionary Baptist Foundation, Inc.*, 712 F.2d 206, 210 (5th Cir. 1983) (the term "insider" to be flexibly applied to include a broad range of parties who have a close relationship with the debtor). *See also 718 Arch St. Assocs. v. Blatstein (In re Main Inc.),* 213 B.R. 67, 81-82 (Bankr. E.D. Pa. 1997) ("A friendly creditor may

---

[3]     The Debtors have separately moved to retain N. William Schiffli and Axioma Partners, LLC as Chief Restructuring Officer [Docket # 48].

#10805272 v3

be an insider of a debtor.") A creditor may have a sufficiently close relationship to qualify as an "insider" when it has access to financial information with respect to the debtor and its reorganization plans, participates in various business decisions and is in a strategic position regarding the debtor's reorganization. *See Committee of Creditors Holding Unsecured Claims v. Citicorp Venture Capital (In re Papercraft Corp.),* 187 B.R. 486, 494-495 (Bankr. W.D. Pa. 1995). Thus, even without the equity ownership, Patriarch would probably qualify as an insider.

35.     Although the Debtors allege that the stalking-horse agreement was negotiated at arms' length, this is by definition an impossibility where the purchaser is an insider. *See* S.Rep. No. 95-989, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Admin.News, pp. 5787, 5810. Where a sale has been orchestrated between insiders, the transaction must be subjected to greatly heightened scrutiny. *Id.*

36.     Because the Patriarch Buyer is an insider of the Debtors, and the "purchase price" is to be in the form of an assumption of insider debt that no non-insider has had a fair opportunity to investigate, the universe of other prospective buyers is certain to conclude that the "fix is in" and decline to spend the resources necessary to conduct due diligence or bid. The Patriarch Buyer will no doubt end up as the winning bidder by default.

37.     The solution to this problem (if the Court decides to authorize a sale process at all at this time) is to allow sufficient time and resources to conduct a "mini-auction" among the field of prospective purchasers to identify a non-insider willing to serve as the stalking-horse buyer in a process that will clearly be non-collusive.

**D.     Patriarch Should Not Be Permitted to Buy The Assets Absent a Distribution to Unsecured Creditors.**

38.     Patriarch could have enforced its alleged lien rights outside bankruptcy, but instead chose Chapter 11 as its preferred vehicle. It should not be permitted to reap the

-13-

benefits of Chapter 11, particularly the premium of § 363(f), without also assuming the burdens of Chapter 11, namely, the payment of administrative expense and priority claims and the assurance of a distribution to unsecured creditors.

39.     The Court has the authority to condition the acceptance of Patriarch's credit bid[4] upon such payment. Section 363(k) permits a secured creditor to bid at the sale "unless the court for cause shown orders otherwise." Because the right to credit bid can be denied for "cause," 11 U.S.C. 363(k), conditions may be placed upon it as necessary to fashion an appropriate remedy. *In re NJ Affordable Homes Corp.*, 2006 Bankr. LEXIS 4498, *58-59 (Bankr. D.N.J. 2006). In *NJ Affordable Homes*, the court conditioned the lenders' right to credit bid by ordering them to pay the commission that would otherwise have been due on the sale of the property. The court reasoned that the commission was "in lieu of the costs a lender would incur to foreclose, market and sell the property." *Id.* At *60.

40.     Section 363(f) is an extraordinary power, *Darby v. Zimmerman (In re Popp)*, 323 B.R. 260, 266 (B.A.P. 9th Cir. 2005), and a powerful right, *In re Takeout Taxi Holdings, Inc.,* 307 B.R. 525, 528 (Bankr. E.D. Va. 2004). The payment of administrative and priority claims and a meaningful distribution on unsecured claims, coupled with an adequate opportunity to market the assets and investigate claims by and against Patriarch, are a reasonable price for Patriarch to pay for such a premium. These costs should be ordered as a condition for the acceptance of any credit bid, in lieu of the costs that Patriarch would have incurred to foreclose, market and sell the assets outside bankruptcy. If Patriarch refuses to pay such costs, then the Court should deny their credit bids for cause. *See In re Exaeris Inc.*, 380 B.R. 741

---

4       Although the Debtors claim that the Patriarch Buyer is not credit-bidding, but merely assuming liabilities, the fact that the Patriarch Buyer is the lender and that no other bidder is permitted to assume the liabilities, renders the stalking-horse purchase price the equivalent of a credit bid for all practical purposes.

-14-

(Bankr. D.Del. 2008) (court refused to approve 363 sale on credit bid, where, *inter alia*, there was no proof of the value of the assets and there would no recovery for unsecured creditors).

### E.     The Court Should Not Permit a Sale of the Chapter 5 Causes of Action.

41.     Even if Patriarch otherwise had the right to credit bid under §363(k), the right extends only to property against which it holds a lien. *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship.*, 248 B.R. 668, 679 (D. Mass. 2000); *In re Hickey Props., LTD.*, 181 B.R. 171 (Bankr. D. Vt. 1995); *In re Pine Coast Enters., Ltd.*, 147 B.R. 30 (Bankr. N.D. Ill. 1992). Its lien does not extend to the estates causes of action under Chapter 5 of the Bankruptcy Code, which, except for claims under § 549, were expressly carved out of DIP lien. Nor does its liens extend to commercial tort claims or causes of action against Patriarch itself. Yet the stalking-horse APA includes among the purchased assets all avoidance actions relating to Patriarch as well as certain suppliers and customers to be disclosed on a schedule, as well as all substantially all other causes of action held by the Debtors. Although the Debtors ostensibly retain avoidance actions against a limited universe of "Excluded Avoidance Actions," the Patriarch Buyer reserves the right to add to its list of acquired avoidance actions (and to strike from the universe of Excluded Avoidance Actions) any and all additional avoidance actions at any point prior to the bid deadline.

42.     The sale of the Patriarch avoidance claims and commercial tort claims is an obvious attempt to insulate Patriarch from any liability to the estates to the degree it does not accomplish the same result through the DIP releases and waivers discussed below. But because Patriarch has no lien on these assets and is providing no additional consideration for their purchase, the Court should not sanction a sale process that is premised on such transfers and releases.

-15-

43.     Finally, there is a fundamental unfairness in allowing Patriarch to own any Chapter 5 actions, commercial tort claims or causes of action against insiders. Patriarch engineered the bankruptcy filing to "cleanse" its portfolio company of unwanted debt and leave nothing for the trade creditors and priority claimants. It would be a perverse miscarriage of justice to allow Patriarch, without any reasonable opportunity for prior Committee review, to acquire, for no cash, all of the potential causes of action against Patriarch, and to allow Patriarch to be the sole party to determine whether to then sue those same trade creditors for avoidance recoveries.

**F.      The Expense Reimbursement is Unjustified and Will Chill Bidding.**

44.     The Debtors propose to pay as much as $300,000 to the Patriarch Buyer if it is not the successful bidder, purportedly in recognition of its "expenditure of time, energy and resources." But the Patriarch Buyer did not incur the usual due diligence expenses that an arms' length buyer would have. Because the Patriarch Buyer is an affiliate of the Patriarch Lenders and the Debtors' shareholders, it was already completely privy to the Debtors' operations and financial condition.

45.     In addition, the Bid Procedures Motion fails to disclose any procedures for submitting, documenting, reviewing and potentially objecting to the expenses to be reimbursed. In the absence of such procedures, the Patriarch Buyer will simply receive a gift of $300,000.

**.II.     THE DIP FINANCING MOTION SHOULD BE DENIED.**

**A.      Introduction**

46.     The Debtors seek to borrow up to $3.4 million from the Patriarch DIP Lenders; to grant them blanket liens on all of the Debtors' assets and superpriority administrative claims; to waive the estates' right to surcharge under § 506(c); and to bind all other parties to the

Debtors' releases, waivers and acknowledgements unless a challenge is filed before the earlier of (a) two business days before the bid deadline; or (b) 75 days after the Petition Date.

47.     Because (a) the DIP Lenders are affiliates of Patriarch; (b) the Debtors' shareholder is an affiliate of Patriarch; (c) the Debtors' management is controlled by Patriarch, (d) the proposed stalking-horse buyer is an affiliate of Patriarch; and (e) Patriarch is the Pre-Petition Lender—the entire relationship among these parties is a hall of mirrors. Every aspect of the DIP financing must scrutinized far more closely than in the typical case, because there is no separation of these various interests.

48.     Under the proposed financing, the Debtors' borrowing availability would never exceed $3.4 million. In exchange, the Debtors have agreed to provide the DIP Lenders with, among other things, a section 506(c) waiver and broad liens and superpriority claims. The Debtors' other creditor constituencies, including vendors and landlords, will gain nothing from the proposed DIP Facility. Indeed, thanks to the Sale Schedule, the DIP facility will not even provide a meaningful chance to attract another buyer. The proposed DIP Facility is nothing more than a vehicle by which to handcuff the estate and dictate the sale outcome that is central to Patriarch chapter 11 strategy.

49.     It is well settled that the Court should only approve post-petition financing if it is "in the best interest of the general creditor body." *In re Roblin Indus.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985). It should not be authorized if its primary purpose is to benefit or improve the position of a particular secured lender. *See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor.").

#10805272 v3

50.     Although the Debtors allege that the terms of their proposed DIP Facility were negotiated in good faith, Patriarch and the Debtors simply cannot deal at arm's length. Indeed, Patriarch was obviously positioned to dictate terms to the Debtors. The proposed financing does not reflect terms negotiated in any form of open market. *See In re The Colod Group, Inc.*, 324 B.R. 208, 219 (Bankr.W.D.N.Y. 2005). Among the evidence the Court must weigh is Debtors' decision to file their chapter 11 petitions 2 days after allowing valuable rights against Patriarch to lapse. Patriarch negotiated the purchase of all of Debtors' causes of action. Apparently, it was not sufficient that these particular causes of action be purchased, subject to Bankruptcy Court approval. Patriarch needed to extinguish these causes of action before ever invoking the Bankruptcy Court's jurisdiction.

51.     However, "[t]he debtor and its secured creditor do not constitute a legislature. Thus, they have no right to implement a private agreement that effectively changes the bankruptcy law with regard to the statutory rights of third parties." *Colod*, at 224. The proposed financing in this case would effectively alter significant rights of the unsecured creditors.

52.     Post-petition financing will not be approved where it is apparent that the purpose of the financing is to benefit the lender-creditor rather than the estate as a whole. *In re Ames Department Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990). Courts must balance the needs of the debtor against the rights and expectations of its creditors, by focusing on those suspect proposed financing terms that would:

    a.     tilt the conduct of the bankruptcy case,

    b.     prejudice, at an early stage, the rights that the Bankruptcy Code confers for the benefit of all creditors, and

    c.     leverage the chapter 11 process by preventing motions by parties-in-interest from being decided on their merit.

#10805272 v3

*Ames*, at 37, *citing In re Tenney Village Co.*, 104 B.R. 562, 567-70 (Bankr. D.N.H. 1989).

> Under the guise of financing a reorganization, the Bank would disarm the Debtor of all weapons usable against it for the bankruptcy estate's benefit, place the Debtor in bondage working for the Bank, seize control of the reins of reorganization, and steal a march on other creditors ....

*Tenney Village*, 104 B.R. at 568.

53.     The proposed financing here would clearly tilt the conduct of the case, by preordaining a rapid transfer of all estate value to the Patriarch insiders; it would disarm the Debtors and other parties-in-interest of the weapons otherwise available to them under the Code; it would prejudice the rights of other parties with respect to their own claims as well as any claims they might have against Patriarch; and it would allow Patriarch to dictate the outcome of these cases.

B.     **The DIP Financing Will Force a Liquidation of the Debtors.**

54.     If the DIP Motion is granted, Patriarch will control the course of these cases, steering them to a swift sale to another insider, without regard to whether a sale is in the best interests of the estate and without regard to whether a sale would result in any recovery for unsecured creditors. Most troubling, given the absence of any independence on the part of the Debtors, is that it would accomplish this result without undergoing any of the scrutiny or rigors of a plan confirmation process.

55.     The DIP Facility, when coupled with the proposed sale, is a *de facto* plan of liquidation. The following DIP Facility terms guarantee Patriarch's chosen outcome:

- The Debtors are in default unless they obtain the Bid Procedures Order within 15 days after the Petition Date

- The Debtors are in default unless they obtain an acceptable sale order within 32 days after the Petition Date.

- The Debtors are in default if the Court approves a sale of any material assets to a purchaser other than the Patriarch affiliate that serves as the stalking-horse buyer.

56.     "The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *In re Seth Co., Inc.*, 281 B.R. 150, 153 (Bankr. D.Conn. 2002). Patriarch's sale scheme would strip every other constituency of its statutory rights to vote on a plan.

57.     For these reasons, the Committee objects to those provisions of the DIP Facility that would require the Debtors to sell their assets, and the timing of such a sale, if ordered. These provisions absolutely predetermine the outcome of this case and leave no room for exploring alternative scenarios for the reorganization of these Debtors. Moreover, these provisions needlessly accelerate the sale process and create a "fire sale" atmosphere that is unlikely to result in maximization of the value of the Debtors' assets. Of course, that is exactly the result intended by the Patriarch Lenders, who in their role as buyer have no incentive to explore reorganization alternatives.

## C.     The Debtors' Waivers and Releases Should Not Bind Other Parties-in Interest.

58.     In the DIP Financing Motion, the Debtors propose to grant myriad waivers, releases and acknowledgments with respect to the pre-petition claims and liens asserted by Patriarch. Specifically, the Debtors assert that the liens are legal, valid, binding, perfected, not subject to defense, counterclaim, surcharge, offset, subordination or otherwise avoidable.

59.     These potential claims and defenses are property of the estate that can be abandoned only upon a finding that they are of inconsequential value to the estate. 11 U.S.C. § 554(b). Yet not only have the Debtors waived these claims and defenses, they seek to bind the Committee to the same admission, unless the Committee obtains an order granting it standing to

-20-

pursue claims on behalf of the estates, and files a proceeding against Patriarch before the earlier of (a) two business days before the bid deadline; or (b) 75 days after the Petition Date. Because the Debtors have requested a bid deadline of April 29, this means that the Committee could be required to file its challenge as early as April 27—a scant 16 days after its appointment.

60.     The Committee objects to this unprecedented abbreviation of the time in which it must perform its statutory duties to: (a) investigate the pre-petition liens and claims of Patriarch, (b) analyze whether they are valid, (c) file a motion seeking standing to challenge the liens and claims, if appropriate, (d) obtain an order granting standing, if necessary,[5] and (e) file a complaint or other proceeding against the Lenders. Even 75 days is woefully inadequate for such tasks, particularly since this period coincides with the period during which the Debtors' sale process will be underway, when the Committee must necessarily be focused on the valuation of assets, the marketing efforts and the auction procedures, or on developing alternative strategies for the reorganization of these companies. The Committee should not be required to expend its limited resources in investigating the Lenders' claims at the same time.

61.     The Committee therefore objects to any provision binding it or any other party to the Debtors' waivers, releases and acknowledgements before the expiration of at least 120 days after the Petition Date. In addition, the Committee submits that any Final Order entered on the DIP Motion should affirmatively provide that the Committee has the full standing of the Debtors and their estates to challenge the validity, enforceability, priority or extent of the prepetition indebtedness and liens, and to bring and prosecute any claim or action against any insider of the Debtors.

---

[5] Given the fundamental conflict that burdens the Debtors, any order approving a DIP Facility (and the Committee submits that no such facility should be approved at all) should grant the Committee the full standing of the Debtors and their estates to prosecute causes of action against any insiders of the Debtors.

#10805272 v3

**D.    The Right of Surcharge Should be Preserved for the Benefit of the Estate.**

62.    Section 506(c) of the Bankruptcy Code allows the debtor or trustee to surcharge the Lenders' collateral for the reasonable and necessary costs of preserving and disposing of such collateral. The Third Circuit explained the policy behind this provision as follows:

> Congress' intent in enacting § 506(c) was to assure that when a claimant "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral, the . . . debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party." 124 Cong. Rec. 32,398 (cum. ed. Sept. 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S. Code Cong. & Admin. News 6451. Thus, . . . 506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant.

*Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus.),* 57 F.3d 321, 325 (3d Cir. 1995).

63.    Thus, "when a secured creditor agrees to the continued operation of a business for the purpose of increasing the ultimate gain in the event of a reorganization or liquidation, the necessary administrative expenses, including taxes, incurred during the continued operation directly benefitted the creditor and were thus recoverable under Section 506(c)." *U.S. v. Boatmen's First National Bank of Kansas City,* 5 F.3d 1157, 1160 (8th Cir. 1993) *overruled on other grounds by In re Hen House Interstate, Inc.,* 177 F.3d 719 (8th Cir. 1999), *aff'd Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1 (2000). *See also Equitable Gas Co. v. Equibank N.A. (In re McKeesport Steel Castings Co.),* 799 F.2d 91, 94-95 (3d Cir. 1986) (secured creditor required to pay for post-petition utility service where such service permitted continued operations and resulted in a higher sale price).

#10805272 v3

64.     A case that is being run for the sole benefit of the lenders, as these cases clearly are, cries out for the preservation of section 506(c) rights, and a waiver of such claims is totally inappropriate. *See Colod*, 324 B.R. at 224. If the Lenders had foreclosed on their collateral outside bankruptcy, they could not have avoided paying all the costs associated with the foreclosure. Instead, in order to maintain the going-concern value of the Debtors' assets, strip the assets of claims and enhance their own recovery, the Lenders chose to avail themselves of the Chapter 11 process. Under such circumstances, not only should section 506(c) rights be preserved for the benefit of the estate, but the Lenders should be expressly required to pay <u>all</u> administrative costs arising from their use of the Chapter 11 process.

## (III)   CROSS-MOTION[6] TO CONVERT THE DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

### A.     Introduction

65.     Under Section 1112(b) of the Bankruptcy Code, as amended by the 2005 amendments to the Bankruptcy Code, the Court must convert a chapter 11 case to a chapter 7 case "for cause" upon the request of a party in interest.[7] 11 U.S.C. § 1112(b). Section 1112(b) states, in pertinent part:

> ...on request of a party in interest, and after notice and hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, **the court shall convert a case under this chapter to a case under chapter 7** or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause....

---

[6]     This Court has jurisdiction to consider this Cross-Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

[7]     The Committee is a party-in-interest in the Debtors' chapter 11 proceedings. *See* 11 U.S.C. §1109(b); *In re Combustion Engineering., Inc.,* 391 F.3d 190 (3d Cir. 2004).

#10805272 v3

11 U.S.C. § 1112(b) (emphasis added). Prior to the 2005 amendments to the Bankruptcy Code, section 1112(b) contained the language "may convert" as opposed to the "shall convert" language which now appears in section 1112(b).

> This change diminishes the discretion the bankruptcy courts have in conversions to Chapter 11. If cause for dismissal or conversion to Chapter 7 exists discretion not to dismiss or convert is limited to those instances in which the court makes specific findings that unusual circumstances 'establish that the requested conversion or dismissal is not in the best interests of creditors and the estate.'

*In re Broad Creek Edgewater, LP,* 371 B.R. 752, 759 (Bankr. D. S.C. 2007). Thus, upon a showing of cause, the Court is not only authorized, it is required to convert the Debtors' chapter 11 cases to chapter 7.

66. The determination of cause is made on a case-by-case basis. *See Halvajian v. Bank of New York (In re Halvajian).* 216 B.R. 502, 511 (D.N.J. 1998). Section 1112(b) provides a nonexclusive list of grounds that constitute cause for conversion. 11 U.S.C. § 1112(b)(4)(A)-(P); *see Nester v. Access Gateway Solutions, Inc. (In re Access Gateway Solutions, Inc.,* 374 B.R. 556, 560-61 (Bankr. M.D. Pa. 2007.[8] Two such separate and

---

[8] Section 1112(b)(4) states that "cause" includes—

    (A)    substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

    (B)    gross mismanagement of the estate;

    (C)    failure to maintain appropriate insurance that poses a risk to the estate or the public;

    (D)    unauthorized use of cash collateral substantially harmful to 1 or more creditors;

    (E)    failure to comply with an order of the court;

    (F)    unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

    (G)    failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

(continued...)

#10805272 v3

independent grounds are (a) a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, and (b) an inability to effectuate substantial consummation of a confirmed plan. 11 U.S.C. §1112(b)(4)(A), (M). Both of these grounds exist here.

### B. Cause Exists to Convert the Debtors' Chapter 11 Cases to Chapter 7 Because There is a Continuing Loss to or Diminution of the Debtors' Estates and an Absence of a Reasonable Likelihood of Rehabilitation.

67. Conversion to Chapter 7 is warranted where a debtor is "suffering substantial or continuing losses to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. §1112(b)(4)(A). Negative cash flow and an inability to pay current expenses as they come due can satisfy this standard. *Gateway Solutions*, 374 B.R. at 562; *In re AdBrite Corp.*, 290 B.R. 209, 215 (S.D.N.Y. 2003). *See also, In re 3868-70 White*

---

(continued...)

    (H)    failure to timely provide information or attend meetings reasonably requested by the United States Trustee (or the bankruptcy administrator, if any);

    (I)    failure to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

    (J)    failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

    (K)    failure to pay any fees or charges required under chapter 123 of title 28;

    (L)    revocation of an order of confirmation under section 1144;

    (M)    inability to effectuate substantial consummation of a confirmed plan;

    (N)    material default by the debtor with respect to a confirmed plan;

    (O)    termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

    (P)    failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

See 11 U.S.C. §11 12(b)(4)(A)-(P).

#10805272 v3

*Plains Road. Inc.,* 28 B.R. 515, 519 (Bankr. S.D.N.Y. 1983) (full collateralization of a debtor's assets, coupled with a negative cash flow and an inability to pay current expenses, presents cause to convert).

68.     The Debtors represent that they are no longer able to sustain their operations. See Declaration of Raul Tejada [Docket # 3], at ¶ 50. Their Sale and DIP Motions make it clear that they have filed Chapter 11 not to reorganize, but rather to pursue a fast-track sale, to an insider, of substantially all their assets.

69.     A debtor "should not continue in control of the business beyond a point at which reorganization no longer remains realistic." *In re AdBrite Corp.* 290 B.R. at 215. Any possibility that the sale proceeds might exceed the stated outstanding secured indebtedness has been completely foreclosed by the structure of the stalking-horse "purchase price." That fact, coupled with the section 506(c) waivers to be given to the Lenders as part of the DIP Facility, the proposed transfer of commercial tort claims and avoidance actions, and the broad releases proposed to be granted to insiders, means that under the process proposed by the Debtors there is no way that all administrative expenses will be paid, or that priority creditors, let alone unsecured creditors, will attain any recovery. As such, the Debtors could not confirm a plan even if they intended to file one.

**C.     Cause Exists to Convert the Debtors' Chapter 11 Cases To Chapter 7 Because the Debtors Are Unable to Effectuate Substantial Consummation of a Confirmed Plan.**

70.     An independent ground for conversion is the inability to effectuate substantial consummation of a plan of reorganization or liquidation. 11 U.S.C. §1112(b)(4)(M); *see also United States Savings Assoc. v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 376 (1988) (to forestall conversion, "there must be a reasonable possibility of a successful

-26-

reorganization within a reasonable time.") Inability to effectuate a plan exists when the "debtor lacks the ability to formulate a plan or to carry one out." *Halvajian*, 216 B.R. at 511-512 (conversion of debtor's chapter 11 case appropriate where lower court found that it was "simply impossible" for debtor to confirm a plan).

71.     The Debtors will not be able to effectuate a plan of liquidation (let alone propose a plan that will provide a distribution to general unsecured creditors) because their proposed sale will not even produce proceeds in excess of the stated outstanding indebtedness of the Lenders, much less to satisfy administrative claims and priority unsecured claims as required under the Bankruptcy Code.

## C.     Conversion Is in the Best Interests of Creditors and These Estates.

72.     Once a bankruptcy court determines that cause exists to convert a debtor's chapter 11 case to chapter 7, the court is required to convert the case "absent unusual circumstances specifically identified by the court that establish that the requested conversion ... is not in the best interests of creditors and the estate...." 11 U.S.C. §1112(b)(l). Here, it is clear that conversion is in the best interests of creditors and the Debtors' estates.

73.     First, conversion of a chapter 11 bankruptcy case advances the best interests of the creditors where a debtor's assets are neither fixed nor liquidated. *See In re BTS, Inc.*, 247 B.R. 301, 310 (Bankr. N.D. Okla. 2000); *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.*, 245 B.R. 794, 799 (E.D. Pa. 2000); *In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982). Here the Debtors' assets have not yet been fixed, sold or liquidated. Thus, there are significant assets for a chapter 7 trustee to oversee and liquidate, including some unencumbered assets (*e.g.*, avoidance action proceeds) which could remain unencumbered for the benefit of the Debtors' estates and general unsecured creditors.

74.     Second, a chapter 7 trustee could investigate the nature and extent of Patriarch's prepetition liens, claims and interests, along with any other causes of action arising out of the Debtors' relationship with Patriarch, all without the time pressures of an artificial challenge deadline imposed at Patriarch's behest.

75.     Third, a chapter 7 trustee could determine the extent of the Debtors' assets, evaluate potential avoidance actions, investigate the validity of any other liens, and confirm the existence of other assets currently unknown to parties other than the Patriarch insiders.

76.     Finally, and critically, a chapter 7 trustee would not be burdened by the inherent and disabling conflict of interest suffered by the Debtors, and so would not be bound to subordinate the estates' interests to the demands of Patriarch.

77.     Accordingly, a chapter 7 trustee is better suited to administer these estates for the benefit of all creditors.  As such, relief is proper in the present case pursuant to § 1112(b)(3) and § 105(a).

**D.     <u>Conversion Should Be Ordered.</u>**

78.     In sum, the Debtors are not using the chapter 11 process to reorganize or to provide distributions to any creditors other than Patriarch.  Instead, these cases were filed in an effort to reap the benefits afforded by a section 363 sale, and far more, for the benefit of insiders without bearing the burdens and obligations of a legitimate reorganization or liquidation under the Bankruptcy Code (*e.g.*, full disclosure, payment of administrative expenses and distribution to the unsecured creditors, *etc.*).

79.     Therefore, cause exists for the conversion of these cases to Chapter 7, and such conversion is in the best interests of the creditors and the estates.

-28-

## CONCLUSION

For all the foregoing reasons, the Official Committee of Unsecured Creditors respectfully requests that the Court enter an Order (a) denying the Bid Procedures Motion; (b) denying the DIP Financing Motion; (c) converting these cases to cases under Chapter 7 of the Bankruptcy Code; and (d) and granting the Committee such other and further relief as the Court may deem just and equitable.

Respectfully submitted,

/s/ David M. Fournier
David M. Fournier (DE No. 2812)
John H. Schanne II (DE No. 5260)
**PEPPER HAMILTON LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Wilmington, Delaware 19801
Tel.: (302) 777-6500
Fax: (302) 421-8390

and

Bonnie MacDougal Kistler
**PEPPER HAMILTON LLP**
400 Berwyn Park
899 Cassatt Road
Berwyn, PA 19312-1183
Tel.: (610) 640-7800
Fax: (610) 640-7835

Proposed Counsel for the Official Committee of Unsecured Creditors

#10805272 v3